Harold HANGER, Appellant,

v.

UNITED STATES of America, Appellee.

Gale MIXEN, Appellant,

v.

UNITED STATES of America, Appellee.

Loretta MEYER, Appellant,

v.

UNITED STATES of America, Appellee.

Nos. 18928–18930.

United States Court of Appeals
Eighth Circuit.

June 28, 1968.

Stanley H. Chorlins, Clayton, Mo., for appellant Mixen.

Paul V. Gilbert, St. Louis, Mo., for appellant Hanger.

Joseph Anthony Dill, St. Louis, Mo., for appellant Meyer.

William C. Martin, Asst. U. S. Atty., St. Louis, Mo., for appellee; Veryl L. Riddle, U. S. Atty.. on the brief.

Before MATTHES, GIBSON and HEANEY, Circuit Judges.

FLOYD R. GIBSON, Circuit Judge.

This is an appeal from the United States District Court for the Eastern District of Missouri from judgments of conviction entered upon jury verdicts finding the defendants, Harold Hanger, Gale Mixen and Loretta Meyer, guilty of bank robbery in violation of 18 U.S.C. § 2113(a) and of conspiracy to commit the offense of bank robbery in violation of 18 U.S.C. § 371. The defendants were first tried November 29–30, 1966, and verdicts of guilty were returned. A motion for a new trial on the basis of newly discovered evidence was subsequently granted, and the defendants were retried on June 12–13, 1967. A jury again found the defendants guilty and judgments of convictions were entered. A timely appeal followed.

Defendants, who were jointly indicted and tried, raise eight grounds of alleged error and, in addition, argue that the evidence was insufficient to support their convictions and that the Court erred in not sustainimg their motions for judgment of acquittal. We will consider each point seriatim. However, after a careful consideration of the evidence and the errors alleged by defendants, we are of the opinion that they received a fair trial and that the evidence supports the jury's findings of guilt. We affirm the judgments of conviction.

The crimes of which the defendants were convicted relate to the robbery of the Chippewa Trust Company of St. Louis on April 8, 1966. The physical act of entering the Bank and taking the money was accomplished by one, Marvin E. Riley,[1] who was identified as the robber. Riley plead guilty to the charge of robbing the Bank and was the principal witness for the Government at both the first and second trials of defendants.

Riley testified that on April 6, 1966, in response to a telephone call from Hanger, he went to a bar where he met the three defendants. Hanger asked Riley if he wanted to rob a bank and Riley replied he would have to go and look at it. The next morning, April 7, 1966, defendants in Mixen's car picked Riley up at his residence and they drove to the south part of St. Louis to the parking lot of the Chippewa Trust Company. Mixen gave Riley two dollars to exchange for a roll of nickles in the Bank, and told Riley to "look the place over" and see what he thought of it. After coming out of the Bank, and replying that "everything looked all right," Riley was driven around the vicinity of the Bank and the escape route that he was to utilize was explained to him. He was to cut through the Bank's parking lot, go down an alley in back of the Bank, through a fence and come out on the next street over from the Bank where he would be picked up. On the morning of April 8, 1966, Hanger called Riley, asked him if he were ready, and told him to get a change of clothes and a brown paper sack. Shortly thereafter the defendants picked up Riley and they drove around looking for an automobile to steal. After being observed by police

1. Riley had a petty criminal record. He had been arrested "quite a few" times, and convicted of three offenses for which he served two jail sentences, prior to the present conviction.

officers in the vicinity of 14th and Clark ("they looked at us pretty hard"), the idea of stealing an auto in that area was discarded. Riley then proposed using the car he had previously sold his brother, a 1955 red and white Ford station wagon. Riley got the station wagon and parked it a few blocks from the Bank. Riley and the defendants then proceeded to drive around St. Louis in order to steal a license plate to put on the auto, which theft Riley accomplished. They then went to Mixen's home where Riley was made up with a heavy moustache by Mixen and Hanger, and Meyer covered a scar on Riley's face with women's makeup. Mixen gave Riley a pair of black-rimmed reading glasses, a brown hat and a brown accordion briefcase. Riley was offered a .38 snub-nosed pistol, but refused it, saying he "was too nervous, too shaky to take a pistol."

Riley and the defendants then drove in Mixen's auto to where the station wagon was parked about three or four blocks from the Bank. Hanger and Riley got into the station wagon, and Hanger dropped Riley off one block from the Bank at the prearranged rendezvous point. Riley walked into the Bank, about 12:30 p. m., and after standing in line for a few minutes walked out and back to where Hanger was parked in the station wagon with the motor running. He explained that there was a guard in the Bank that he thought was watching him. Hanger, displeased at Riley's abortive attempt, then drove about fifteen blocks where they met Mixen and Meyer. The four then discussed Riley's failure to perform. Hanger and Mixen stated "they needed money pretty bad" and "the idea come up about a supermarket."

Riley and Hanger then drove in the Ford to a shopping center in north St. Louis via Interstate 70, followed by Mixen and Meyer. Detective Scheetz, also driving on Interstate 70, recognized Hanger and Riley, particularly noticing the latter's moustache since he had never known Riley to wear one before. De-

tective Scheetz wrote down the number of the Ford's license plate, which he subsequently found to have been stolen on April 8 in south St. Louis. After arriving at the shopping center, defendants and Riley decided it would be better to rob the Bank.

Riley drove the Ford to his residence and waited a few hours. The defendants then came by for Riley and they proceeded to the vicinity of the Bank, Riley parking the Ford in the same spot as that morning. Riley then entered the auto carrying the defendants and they proceeded to a bar where they stayed between a half-hour and an hour. Riley and the defendants then drove back to where the Ford was parked, and Hanger and Riley got into the Ford. Hanger drove the Ford to an alley close to the Bank and said that he would wait for Riley in the alley rather than on the street as previously planned.

Riley then walked about a block and one-half to the Bank, entered the Bank about 5:00 p. m. and robbed it by handing the teller, Mrs. Julie Chappell, a note and an accordian briefcase. Mrs. Chappell said the note stated in essence —this is a robbery, give me all your money; I have a gun; don't push any buttons or I will kill you. After the briefcase was filled with money, Riley took it from Mrs. Chappell and seized the note from her hand placing it in the briefcase. Pictures of Riley were taken upon Mrs. Chappell's activating a hidden button. Of the approximately $1998 taken, $500 were in $20 bills the serial numbers of which had previously been recorded. Riley then met Hanger in the alley and jumped into the Ford station wagon's back seat where he removed his disguise clothing and began removing the moustache while Hanger drove. Hanger and Riley again met with Mixen and Meyer, abandoning the Ford station wagon. They then proceeded in Mixen's car to a bar where Meyer left in a cab with the proceeds from the robbery.

Mixen then gave Riley $5 and told him to go to the Jeffla Bar, where Riley waited until Mixen and Hanger pulled

up to the bar and honked for Riley who joined the pair in proceeding to Mixen's apartment. The proceeds of the robbery were then split three ways, Riley, Mixen and Hanger each getting about $675. Each of the three gave Meyer about $20 or $25 for her participation.

After the division of the "loot", Riley went home and while watching the evening news saw photos taken of the Bank robbery. Apparently Riley panicked and, after spending the night at home, rented a room at the Northwestern Hotel for a week where he "holed up" and remained intoxicated. He returned to his home on April 14 and was arrested; $220 of the Bank's money was recovered from him. On April 15, the FBI in cooperation with the St. Louis police obtained a search warrant that was served on 1419–1421 North Park Place, the residence of Mr. and Mrs. Hanger and Mr. and Mrs. Meyer. On the second floor of the Hanger side of the premises, an FBI agent found $180 in $20 bills under the cover of a wall phone; five of the $20 bills had serial numbers corresponding with bills taken from the Chippewa Bank in the robbery of April 8. A St. Louis police officer in searching the Meyer residence found in a purse two $20 bills that were likewise matched to serial numbers of the money stolen in the Bank robbery.

Shortly after his arrest, Riley gave a statement to the FBI indicating that he was the sole participant in the robbery of the Bank. While in custody at the City jail, Riley signed a statement to the effect that Hanger had nothing to do with the robbery and that Riley had purchased Hanger's automobile with $300 of the proceeds from the robbery.[2] On May 4, Riley was sent to the United States Medical Center at Springfield, Missouri, to be examined by Government doctors to determine his mental condition. Dr. Wilinsky of the psychiatric staff in a report of May 26, 1966, indicated that Riley gave an account of the robbery similar to that which he had given the FBI. Dr. Wilinsky noted then that on June 3, Riley gave a different account of the robbery which was consistent with the testimony he subsequently gave at defendants' trial. Dr. Alderete of the psychiatric staff made a report dated July 19, 1966, which contains statements by Riley consistent with his trial testimony.

Riley testified that he at first intended to take the "rap" and not "rat" on the defendants or be a "fink". He feared bodily harm while in jail with Hanger, and signed a statement prepared by Hanger exculpating Hanger of the robbery. After relaxing at the United States Medical Center, Riley decided to straighten things out and tell the truth as his wife had been harassed by an unknown caller, the defendants had threatened him and his wife, and he feared for his life.

Meyer testified but the other defendants did not. The defendants denied Riley's accusations of being associated with him in the bank robbery, attacked Riley's credibility and attempted to establish an alibi.

## I. INSPECTION OF THE GRAND JURY MINUTES PRIOR TO TRIAL

The defendants moved, before trial, for an order authorizing them to inspect the grand jury minutes or, in the alternative, for the Court to inspect the minutes. Although various reasons were advanced by defendants in support of their reasons for production, the principal argument made was that the minutes were necessary to test the credibility of the principal Government witness, Riley, and to check on inconsistent testimony and statements made by Riley. Defen-

---

2. Hanger owned a 1957 Oldsmobile "88", the condition of which Riley described as: "Pretty sad. The tires was all flat. The hood was all raised up, the glass was broken out of it; there were dents in the doors, too, I believe; the fenders."

Riley testified he would not have paid $300 for the auto. Hanger's brother, James, testified that twice during late March and early April of 1966 he jumped the battery of the auto for his brother in order to get the car running.

dants were aware of the statements made by Riley, and had reason to believe that his testimony before the grand jury was inconsistent with these statements.

Defendants assert that they made a showing of particularized need sufficient to bring the need for Riley's grand jury testimony within the purview of Dennis v. United States, 384 U.S. 855, 86 S.Ct. 1840, 16 L.Ed.2d 973 (1966). In *Dennis* the Court, while recognizing the " 'long-established policy that maintains the secrecy of the grand jury proceedings in the federal courts.' United States v. Proctor & Gamble Co., 356 U.S. 677, 681, 78 S.Ct. 983, 2 L.Ed.2d 1077.", permits and commands a discrete and limited disclosure of grand jury minutes upon a showing of "particularized need" and recognized that the use of a grand jury transcript at the trial to impeach a witness or to refresh his recollection or to test his credibility are " 'cases of particularized need \* \* \* ' " 384 U.S. 870, 86 S.Ct. 1840. The motion to produce the grand jury transcript in the *Dennis* case was made at the conclusion of the direct examination of the trial witnesses. The defendants in the case at bar, however, did not desire the production of Riley's grand jury testimony at that time but sought to secure it in a pretrial motion for discovery. We do not think *Dennis* commands the disclosure of a witness's grand jury testimony prior to the time of his testimony at trial. The Court refused in United States v. Proctor & Gamble Co., supra, to permit pretrial disclosure of an entire grand jury transcript in a civil case. Obviously a grand jury transcript if used at all on a hostile witness, would be used to impeach the witness or to test his credibility. This can be done at the time the

witness has concluded his direct examination, and as a practical matter the grand jury transcript should be produced at the time of the direct examination so that defense counsel would have the transcript while the witness is testifying and is available for cross-examination. It is apparent that defendants knew this and did not desire the grand jury transcript at that time. Notwithstanding such knowledge, the defendants forewent the opportunity set forth in *Dennis* and embraced in the principle of § 3500 of Title 18, U.S.C. relating to statements, to make a proper request for the grand jury minutes, preferring to stand on their pretrial discovery requests.

The Second Circuit, considering the import of *Dennis* on its disclosure procedures, in United States v. Youngblood, 379 F.2d 365, 369 (2 Cir. 1967) held that grand jury minutes should be made available to a defendant for impeachment purposes after a witness has testified against him at trial, disclosure being limited to that portion of the witness's grand jury testimony which was the subject of direct examination at the trial.[3]

In Cargill v. United States, 381 F.2d 849, 851–852 (10 Cir.1967) the Court considered *Dennis* as requiring the defense to be furnished the grand jury transcript of the witness's testimony when the jury's functions are ended, and when the request is made during the course of trial and is necessary for cross-examining the witness for the purpose of impeachment, to refresh his recollection, or to test his credibility.[4] Defendant's pretrial request for the production of the grand jury testimony of

---

3. Under such circumstances, the Second Circuit now holds that disclosure of grand jury testimony should be granted without requiring a showing of particularized need by the defendant. 379 F.2d at 370. This Court disagrees with the holding in *Youngblood* to the extent that a showing of particularized need is abrogated irrespective of the circumstances. National Dairy Products Corporation v. United

States, 384 F.2d 457, 460–461 (8 Cir. 1967).

4. In *National Dairy Products*, supra, pp. 460–461 of 384 F.2d, this Court indicated disagreement with the holding in *Cargill* in that that case implied the particularized need requirement is met *per se* by the mere timely motion for inspection irrespective of other circumstances involved.

Government witnesses, including a principal witness, was denied: "The request was based only on the assertion of the appellant that such disclosure would serve the ends of justice or aid in the preparation for trial. These requests were much too broad and do not come within the *Dennis* rule." 381 F.2d 853.

In United States v. Zborowski, 271 F. 2d 661, 668 (2 Cir.1959), cited by defendants as expressing their "feeling", it is stated:

> "Our standards of fair play in federal criminal proceedings require that the government should present its evidence in its true colors and that it should never be a party to withholding any evidence which materially bears on the credibility of a witness it places on the stand."

Defendants, however, omit quoting the language immediately following that above quoted:

> "Thus it would seem to be better practice, and a saving of considerable time to all concerned, in cases such as this, where there are obvious discrepancies on material matters, for the government to make such grand jury minutes available to the defense at the end of the direct examination."

Although grand jury minutes are not encompassed by the "Jencks Act," 18 U. S.C. § 3500,[5] that Act directs that statements of Government witnesses are not available to the defense until the witness has testified on direct examination in the trial of the case, and only that portion of the statement that relates to the subject matter of the testimony is deliverable on timely motion by the defense. Rule 16, Fed.R.Crim.P., "Discovery and Inspection," subsection (b) expressly limits the availability of witnesses' statements to 18 U.S.C. § 3500 procedures. It was not until 1966 that the Federal Rules of Criminal Procedure were amended to permit the defendant in his discovery operations to secure his recorded testimony before a grand jury

upon his specific request. Rule 16(a) (3).

These provisions represent Congressional intent and Judicial pronouncements on the scope of allowable pretrial discovery and inspection of witnesses' statements and cannot be lightly disregarded in a consideration of the issue at hand. For what the defendants in the case at bar seek is an extension of existing case law to allow an extraordinary means of pretrial discovery. United States v. Jaskiewicz, 272 F.Supp. 214, 216 (E.D.Pa.1967). Under the showing made by defendants, the granting of the motion for inspection of grand jury minutes prior to trial would be necessitated when a defendant merely alleged he had reason to believe that a Government witness presented testimony before the grand jury which was inconsistent with other statements the witness may have made. Such a rule would be neither desirable nor consonant with the interests of justice. While intensive cross-examination, including impeachment, of the testimony of a witness at trial is a proper and salutary trial practice utilized in ascertaining the truth or falsity of a witness's testimony, what a Government witness will testify at the trial, or if indeed he will be called to testify at all, is not known prior to trial.

Where production of grand jury minutes is sought on the basis that they are needed for impeachment purposes or to test the credibility of a witness it would seem to us that the proper time for such a motion is at the time the witness testifies at trial, upon a showing of particularized need for inspection. A proper and timely request would make the minutes available for cross-examination to test the witness's credibility and for impeachment purposes. Dennis v. United States, supra; National Dairy Products Corporation v. United States, 384 F.2d 457, 462 (8 Cir.1967). A timely request was not made here. This request should have been made during or

5. Pittsburgh Plate Glass Co. v. United States, 360 U.S. 395, 398, 79 S.Ct. 1237, 3 L.Ed.2d 1323 (1959).

after the direct examination of the witness.[6]

## II. THE MOTIONS TO SUPPRESS THE EVIDENCE

Defendants argue that the places searched and the items seized were inadequately described in the application and search warrant and that the Court erred in not holding the warrant invalid and the items seized suppressed. Defendants first note that although the Government had available to it the serial numbers of the money it was searching for, the serial numbers were not set out in the warrant. Second, defendants urge that a portion of the money seized was taken from 1419a North Park Place, which is an entirely separate apartment from 1419 North Park Place which was described in the warrant. Further, defendant Meyer is not mentioned by name, and a portion of the money was taken from her premises at 1421 North Park Place.

The affidavit and search warrant, entitled "United States of America vs. Harold Hanger", read in pertinent part that there is reason to believe that:

"* * * on the premises known as and numbered 1419 and 1421 North Park, in the City of St. Louis, Missouri, being a two story building of brick and masonry construction, and consisting of two family dwelling units immediately adjacent to each other and connected with each other by an entryway, in the Eastern District of Missouri there is now being concealed certain property, namely monies taken in the robbery of the Chippewa Trust Company, a federally insured institution, such funds and monies consisting of United States currency and bills of various denominations from $1.00 to $100.00, and including twenty-five $20.00 bills from which the serial numbers had been previously recorded, * * *."

From the testimony adduced at the hearing held on the motions to suppress, it appears that both the 1419 and 1421 sides of the dwelling described are under one roof; that there is one outside entrance to each side, and above that entrance there appears the respective number of that side, 1419 and 1421. Apparently, 1419a and 1421a were only designated on the front side of the building and did not appear above the entrances to the respective sides of the dwelling. Apartment 1419 was unoccupied; Mr. and Mrs. Meyer occupied both 1421 and 1421a. A Federal Agent observed that on the second floor of the 1419 side there is a way to get through to the 1421 side, but he did not attempt to crawl through the entryway.

■ Defendants' contention that the warrant should have specified the numbers of the bills being searched for is not well taken. Not all of the money taken from Chippewa Trust was money of which the serial numbers had been recorded. We know of no rule of law that does not allow police officers and Government agents to search for "loot" from a bank robbery under a valid search warrant based on probable cause, and defendants here do not challenge the sufficiency of the warrant on the basis that it was not issued on a proper showing of probable cause. Defendants' argument in its broadest terms would preclude a search for the "loot" from any bank robbery where the serial numbers of the currency taken was not known. Defendants' argument in its narrowest terms would invalidate a warrant to search for currency where part of the serial numbers were known and not specifically set forth in the search warrant. If defendants' contention were the rule, then other currency which could be part

6. As a practical matter the defense usually indicates its desire for the grand jury minutes at the time of the direct examination during the trial. The minutes are produced and given to defense counsel to peruse during the direct examination to conserve trial time and limit trial delays. However, the minutes need not be produced until the direct examination is concluded and may be excised of extraneous matter.

of the "loot" would not be subject to seizure. The laws on reasonable search cannot produce such incongruous results. The "loot" was described with sufficient particularity. United States v. Howell, 240 F.2d 149 (3 Cir. 1956).

■ Defendants' contention that the search was invalid because it was conducted in apartment 1419a, and not in 1419 as described in the warrant, and because it was directed at defendant Meyer, not named in the warrant, does not persuade us either. We start with the proposition that "It is enough if the description is such that the officer with a search warrant can, with reasonable effort ascertain and identify the place intended." Steele v. United States No. 1, 267 U.S. 498, 503, 45 S.Ct. 414, 416, 69 L.Ed. 757 (1925). While defendants seek to bring themselves within the scope of those decisions that hold a warrant invalid which describes an entire building when cause is shown for searching only one apartment therein, we believe the warrant sufficiently sets forth the place to be searched. The entrance ways to the two sides of the multi-family dwelling were designated by number, "1419" and "1421". Considering the outside of the structure, the search warrant correctly described the dwelling as housing two separate apartments, both of which the search warrant was clearly designed to cover. In United States v. Santore, 290 F.2d 51, 66–67 (2 Cir.1960) cert. denied 365 U.S. 834, 81 S.Ct. 749, 5 L.Ed.2d 744, the Court sustained a warrant which directed the search of a one-family house identified by street and number, even though officers upon presentation of the warrant learned that the defendant occupied the basement and second floor of the house while the first floor was rented to a family not involved in the alleged crime. In United States v. Jordan, 349 F.2d 107, 108–109 (6 Cir.1965), there was no indication that the house might have been divided into more than one living unit when it was searched, and it was held that the description and location of

the premises were properly and adequately set out in the search warrant.

The warrant sufficiently described the premises to be searched with sufficient particularity to allow officers to conduct a reasonable search. The affiant had reasonable grounds to believe that defendants' dwelling was as characterized in the complaint and warrant and, under the circumstances of this case, the description "1419" would also cover "1419a."

■ With regard to Mrs. Meyer not being specified by name in the warrant, it is undisputed that she and her family occupied the entire 1421 side of the dwelling that was searched. Although desirable, a search warrant otherwise sufficient is not rendered invalid by the omission of the name of the owner or occupant of the premises to be searched. Dixon v. United States, 211 F.2d 547, 549 (5 Cir.1954); United States v. Bell, 17 F.R.D. 13, 14 (D.C.1955).

### III. THE MOTIONS FOR SEVERANCE

Defendants claim error in the Court's denying their respective motions for a severance, asserting that the joint trial prejudiced their right to a fair trial. Their claim is based on the contention that not all of the evidence introduced at trial was admissible as to all of the defendants. This is true in almost all conspiracy cases.

■ Rule 8(b) and Rule 13, Fed.R. Crim.P., clearly allow the joinder of defendants, which is acknowledged by them. Further, "It is well settled that the trial court has a wide range of discretion in the matter of granting separate trials, and that it must be affirmatively shown that prejudice resulted from the failure to grant a separate trial." Fisher v. United States, 324 F. 2d 775, 781 (8 Cir.1963), cert. denied 377 U.S. 999, 84 S.Ct. 1935, 12 L.Ed.2d 1049; see Golliher v. United States, 362 F.2d 594, 603 (8 Cir.1966).

The defendants were charged jointly in a substantive count and a conspiracy count. There has been no showing of

prejudice. Rizzo v. United States, 304 F. 2d 810, 818 (8 Cir.1962), cert. denied, Nafie v. United States, 371 U.S. 890, 83 S.Ct. 188, 9 L.Ed.2d 123, states the applicable rule:

> "The feature of certain evidence being evidence against one defendant but not against another defendant is usually present in every joint trial. It is well settled that the fact that in a joint trial there will be evidence against one defendant which is not evidence against another defendant does not require separate trials. Costello v. United States (8th Cir.1958), 255 F.2d 389, 395, certiorari denied (1958), Cannella v. United States, 358 U.S. 830, 79 S.Ct. 51, 3 L.Ed.2d 69."

■■ Moreover, once a conspiracy is proved, evidence against one is evidence against all. Simons v. United States, 119 F.2d 539, 546 (9 Cir.1941), cert. denied 314 U.S. 616, 62 S.Ct. 78, 86 L.Ed. 496; see, National Dairy Products Corporation v. United States, 350 F.2d 321, 337 (8 Cir.1965), vacated and remanded on other grounds 384 U.S. 883, 86 S.Ct. 1913, 16 L.Ed.2d 995; Marbs v. United States, 250 F.2d 514, 522 (8 Cir.1957), cert. denied, Sarkis v. United States, 356 U.S. 919, 78 S.Ct. 703, 2 L.Ed.2d 715. The same applies to the substantive offense where it was shown that the parties were acting in concert. The Court carefully instructed the jury to consider each offense charged and the evidence introduced thereon separately as to each of the defendants. The surrounding circumstances and evidentiary situation were not unusual in the case, and the jury could reasonably be expected to follow the instructions. See United States v. Hanlin, 29 F.R.D. 481, 485–486 (W. D.Mo.1962).

## IV. AFFIDAVITS FOR DISQUALIFICATION

Following the granting of a new trial, defendants timely filed affidavits of bias and prejudice pursuant to 28 U.S.C. § 144 [7] against Judge Meredith, who presided at defendants' first trial, to prevent Judge Meredith from hearing defendants' retrial. Judge Meredith ruled the affidavits insufficient at law and ordered them stricken.

The substance of defendants' affidavits is identical and sets forth as reasons for the belief that bias or prejudice exists: at the sentencing of Riley, Judge Meredith stated that the defendants planned the robbery of the Chippewa Trust Company, the defendants solicited and induced Riley to participate in the robbery, defendant Mixen wrote the note used in connection with the robbery, and the defendants were persons deserving of severe punishment.

Defendants rely on Berger v. United States, 255 U.S. 22, 41 S.Ct. 230, 65 L. Ed. 481 (1921), which held that when presented with an affidavit of prejudice a judge may not pass upon the truth or falsity of the allegations therein, but must accept them as true for the purpose of passing upon the legal sufficiency of the affidavit. Defendants urge that under *Berger* supra, Judge Meredith erroneously failed to disqualify himself, the requisite statutory averment of personal bias and prejudice being sworn to. We disagree.

■ Judge Meredith's remarks were made after the first trial of defendants where a jury found them guilty of the robbery and conspiracy charges against them. Judge Meredith's remarks at the sentencing of the confessed co-conspirator, Riley, regarding defendants' participation in the robbery were in essence

---

7. 28 U.S.C. § 144 reads in relevant part:
 "Whenever a party to any proceeding in a district court makes and files a timely and sufficient affidavit that the judge before whom the matter is pending has a personal bias or prejudice either against him or in favor of any adverse party, such judge shall proceed no further therein, but another judge shall be assigned to hear such proceeding.
 "The affidavit shall state the facts and the reasons for the belief that bias or prejudice exists * * *."

restatements of what the jury had found defendants guilty of. "The bias contemplated by 28 U.S.C.A. § 144 is a personal bias, extrajudicial in origin, that a judge may have against a particular defendant." Hodgdon v. United States, 365 F.2d 679, 686 (8 Cir.1966), cert. denied 385 U.S. 1029, 87 S.Ct. 759, 17 L.Ed.2d 676. In United States v. Grinnell Corp., 384 U.S. 563, 583, 86 S.Ct. 1698, 16 L. Ed.2d 778 (1966), the Supreme Court defined the showing necessary under *Berger* stating: "The alleged bias and prejudice to be disqualifying must stem from an extrajudicial source and result in an opinion on the merits on some basis other than what the judge learned from his participation in the case." We do not believe the sentencing of Riley to be a proceeding separate and distinct from defendants' first trial as defendants assert, and Judge Meredith's remarks pertaining to defendants' guilt as previously found by a jury would be an expression of one of the factors that Judge Meredith undoubtedly took into consideration in sentencing Riley. The remarks were derived from proceedings had before the court, and not on attitudes or conceptions that were formed outside the courtroom, so as to constitute disqualifying personal bias or prejudice. See, Tynan v. United States, 126 U.S.App.D.C. 206, 376 F.2d 761, 764–765 (1967), cert. denied 389 U.S. 845, 88 S. Ct. 95, 19 L.Ed.2d 111.

It is to be noted that this is not the case where defendants allege that the Court's prejudice manifested itself at either the first or second trials. At oral argument, defendants candidly admitted the Court did not display any prejudice or bias, defendants choosing to rely on the sufficiency of their pretrial affidavits as demonstrating the requisite statutory bias or prejudice to require disqualification, " * * * [B]ias or prejudice which can be urged against a judge must be based upon something other than rulings in the case." *Berger*, supra, at 31, 41 S.Ct. at 232. We hold the affidavits insufficient in this regard.

## V. TESTIMONY REGARDING THE SUPERMARKET

Defendants contend that the Court erred in admitting the testimony of Riley, "They said they needed money pretty bad and the idea come up about a supermarket."—thus, indicating a possible intent to rob a supermarket. The testimony complained of was elicited in the course of the Government's direct examination of Riley; Riley was explaining the events subsequent to the abortive attempt to rob the Bank when he and Hanger met Mixen and Meyer. Government counsel asked Riley, "Where did you go from there?" Defendants' counsels' objections were overruled. Riley answered the question: "Well, we stood there and talked for a while, I stayed in the Ford, and Harold Hanger got out and Gale Mixen got out of his car and they was talking. They said they needed money pretty bad and the idea come up about a supermarket." Government counsel then asked, "Sir, did you go any place from there?" Riley then told of the trip to north St. Louis along Interstate 70, the trip on which Hanger and Riley were recognized by Officer Scheetz. Riley then proceeded with his testimony, no further mention being made of the supermarket.

Defendants urge that Riley's testimony concerning the supermarket was highly prejudicial, being evidence of a crime other than ones charged in the indictment and having no tendency to prove any material fact in connection with the crimes charged. We believe no error was committed in reception of the objected-to statement concerning the supermarket for several reasons.

First, the testimony does not directly state that defendants planned or intended to rob a supermarket; in the context of Riley's testimony, which was quite lengthy, we seriously doubt that the jury took the meaning of the phrase "the idea come up about a supermarket" to mean the defendants planned or intended to rob a supermarket especially in light of the fact that Government coun-

sel directed this phase of Riley's interrogation to testimony concerning the sequence of events on the day of the robbery and no testimony was elicited either before or after the alleged prejudicial statement bearing on the "idea of a supermarket."

■ Second, even if the statement patently implied that defendants considered robbing a supermarket as defendants strenuously urge, the Court was not in error in allowing the testimony. "The Government has considerable leeway in offering evidence of other offenses in conspiracy prosecutions." 3 Orfield, Criminal Procedure under the Federal Rules, § 26:506 (1966); see, Egan v. United States, 137 F.2d 369, 382 (8 Cir.1943), cert. denied 320 U.S. 788, 64 S.Ct. 195, 88 L.Ed. 474. As the trial court noted in overruling the defendants' objections, the statement shows the intent of the parties and that they were acting in concert. In Welch v. United States, 371 F.2d 287, 293–294 (10 Cir.1966), cert. denied 385 U.S. 957, 87 S.Ct. 395, 17 L.Ed.2d 303, (a nonconspiracy case) the Court summarized the well established rules of law that defendants urge should control here:

> "Evidence of the commission of crimes not charged, as such, is not admissible; evidence of unlawful conduct, material to the crime charged, should not be admitted if its admission diverts the case into a 'trial within a trial' and in actuality exposes the defendant to a conviction for a crime not charged * * *."

But that Court went further to hold that "* * * evidence tending to prove a material fact although incidentally showing the defendant to have committed another crime * * * is not inadmissible because of a potential side effect." The Court in *Welch* held the trial court did not abuse its discretion in allowing the admission of evidence tending to show defendant guilty of immorality, which evidence centered on defendant's expenditures in support of his extramar-

ital experiences, where the charge was tax evasion.

In summary, we do not believe the statement complained of was evidence of unlawful conduct; if it were, it was admissible to show defendants' concerted intent; and, it was admissible to show a material fact in the Government's case, which is that Riley and Hanger were seen together on the day of the robbery proceeding on Interstate 70, and that the three defendants conferred together after the abortive attempt to rob the Bank. There was no undue emphasis placed on that utterance, which occurred in a narrative recital of the events of the conspiracy and robbery of the Bank.

## VI. THE RECEPTION INTO EVIDENCE OF RILEY'S PRIOR CONSISTENT STATEMENT

On cross examination the Government's principal witness, Riley, was confronted by defense counsel with statements inconsistent with his trial testimony—statements that exculpated defendants from participation in the robbery. Shortly after his arrest, on April 14, Riley gave a statement to the FBI indicating he alone planned and perpetrated the robbery; thereafter, while being confined in the City jail with Hanger, Riley signed a statement exculpating Hanger; after being sent to the United States Medical Center at Springfield, on May 26, 1966, Riley gave a statement to Dr. Wilinsky similar in content to that given the FBI. Riley admitted making the statments, but denied the truth of the facts contained therein. Defense counsel then asked Riley: "Mr. Riley, do you feel that your testimony against the defendants will help you any in getting out of this bank robbery and this scrape you have got yourself into?" Riley answered: "I don't know how it can help me; I got ten years." and "No, sir, I don't."

On redirect, Government counsel elicited from Riley the reasons for his giving the statements: With regard to the FBI statement, "I just wanted—I thought I was something and I didn't

want to be no rat or no fink is what they call it." The statement exculpating Hanger was given shortly after Hanger was incarcerated at the City jail on the federal tier along with Riley and 30 to 40 other prisoners; the cells are opened during the day, and prisoners can roam on the tier. In this environment, Riley explained the prisoners "schemed up this little note here." And, "If I wouldn't have signed this I would more or less get my head beat in or something over in that jail." Riley also explained that after a period of thinking things over at the Medical Center he decided to straighten things out.

Government counsel then sought to introduce a portion of a psychiatric staff examination report signed by Dr. Joseph F. Alderete of the Medical Center, dated July 19, 1966, which was received over defendants' objection: "The patient states that he was pushed into the alleged crime with which he is charged by other individuals." Riley acknowledged making the statement.

Defendants allege the Court committed prejudicial error in allowing into evidence the prior consistent statement made by Riley, the general rule being that statements of a witness consistent with his trial testimony are not admissible on redirect examination for the purpose of rehabilitating the witness, and recognized exceptions to the rule do not apply in the case at bar.

The admission of prior consistent statements to support a witness impeached by prior inconsistent statements has plagued the courts for centuries and according to Wigmore " * * * the judicial divergence of views is most vigorous * * *." IV Wigmore, Evidence, § 1126 (3rd Ed.1940).

All cases acknowledge the general rule but varying factual situations have caused the courts to carve out exceptions in the interests of improving and refining the fact-finding process. The policy

of this Circuit was well expressed by Judge Sanborn in Affronti v. United States, 145 F.2d 3, 7 (8 Cir.1944):

"The general rule is that when the testimony of a witness has been impeached by evidence of his prior inconsistent statements, his testimony ordinarily may not be confirmed by proof of his prior consistent statements. An exception to the rule is that if the testimony is assailed as a fabrication, proof of the prior consistent statements of the witness (which ante-date the existence of motive to fabricate) may be admitted to sustain his credibility." (Numerous citations omitted).[8]

In dealing with the charge of fabrication and the exception to the general rule where the witness's testimony is assailed as a fabrication, the Court in *Affronti* recognized the many factual situations that would probably cause this type of evidence to be committed to the discretion of the trial judge, reasoning as follows, p. 8:

"We think that the question of the admission or rejection of evidence of prior consistent statements to sustain the credibility of a witness who has been impeached by evidence of prior inconsistent statements is addressed to the sound discretion of the trial court, and that its ruling should not result in a reversal on appeal except where there has been a prejudicial abuse of discretion. See Wigmore on Evidence, 3rd Ed., Vol. IV, § 1126, p. 199. Evidence of prior consistent statements should, of course, be received with great caution and only for the purpose of enabling the jury to make a correct appraisal of the credibility of the witness who has been impeached."

An excellent annotation on this subject appears in 75 A.L.R.2d 909–979 (1961), Anno: Corroboration—Consistent State-

---

8. Another exception relating to the use of the whole statement when a part has been used is not applicable here.

ments. The Annotation in § 2, p. 920 relates:

"It is a universal rule that where the witness is charged with giving his testimony under the influence of some motive prompting him to make a false or colored statement, it may be shown that he made similar declarations at a time when the imputed motive did not exist, for such declarations tend to show that the testimony was not an afterthought and rebut the theory of fabrication.

\* \* \* \* \* \*

"The admission of evidence of prior consistent statements of a witness who has been impeached by the imputation of bias or a motive to falsify constitutes an exception to the general rule which excludes such declarations made out of court. Another exception to that rule, quite similar in character, is recognized in the case of a witness whose testimony is assailed as a fabrication of recent date. The authorities generally hold that where a witness is impeached by imputations, or by evidence tending to show, that his sworn testimony is a recent fabrication, or represents a complaint recently made, consistent statements made by the witness prior to the claimed fabrication may be received to refute the impeaching evidence or repel the imputation."

Defendants' position is that the prior consistent statement of Riley does not fall within the exception to the rule noted above because the statement was made *after* the inconsistent statements were made and the motive of Riley to

fabricate was greatest—to shift responsibility for the crime to others after reflection. The Government argues that Riley's consistent statement was made after being removed from the pressures of the outside world and Riley, after having undergone tests and treatments, would be more likely to give a truthful statement to his treating and diagnosing physician.

Though some courts hold that the prior consistent statements must have been made prior to the impeaching statements, it appears to us that such distinction and basis of trustworthiness is not well taken. We recognize a conflict in the cases on this precise issue and agree with Wigmore, supra, § 1126, who, in discussing the cases admitting consistent statements only when uttered before the self-contradiction, notes that " \* \* \* this seems an unnecessary refinement."

Rule 26, Fed.R.Crim.P., provides that "The admissibility of evidence \* \* \* shall be governed \* \* \* by the principles of the common law as they may be interpreted by courts of the United States in the light of reason and experience." The trial court did not in the case at bar predicate admissibility of Riley's prior statement on the fact that it was given after the impeaching inconsistent statements, nor did the trial court decide that Riley's prior consistent statement was untrustworthy as defendants would have had him do. The trial court acted with sound discretion in letting the jury hear both the inconsistent and consistent statements and in allowing the jury to determine the trustworthiness of the statements.[9] In Copes v.

---

9. As noted in McCormick, Evidence § 50 (1954):

"One who has read the description of the present practice of impeachment and support, in the preceding sections, will have marveled at the archaic and seemingly arbitrary character of many of the rules. He will also have observed with regret the laggard pace of the law in taking advantage of the techniques and knowledge which are afforded by the modern sciences of

physiology and psychology in appraising the perception, memory and veracity of witnesses. Two principal retarding influences are apparent, namely, an undue distrust by the judges of the capacity of jurors, and an over-emphasis upon the adversary or contentious aspect of our trial tradition."

The National Conference of Commissioners on Uniform State Laws in their Uniform Rules of Evidence, provided in Rule 20, Evidence Generally Affecting

United States, 120 U.S.App.D.C. 234, 345 F.2d 723, 726 (1964), the Court considered the circumstances of that case and concluded that admissibility of a prior consistent statement made *after* prior inconsistent statements need not be determined on the factor as to when the statement was made irrespective of other factors.

 In the case at bar, the trial court acted within its discretion in admitting Riley's consistent statement, especially in light of the fact that Riley, and the person to whom he gave the statement, Dr. Alderete, were available for cross-examination concerning the statement, an opportunity that was utilized by defendants' counsel. In addition, we think that in the situation where a key witness admittedly changes his story or his recital of important relevant events and admits that his former statements in regard to the proceedings in question were a fabrication, that he should be allowed to not only testify as to what he now swears is a true recital of the events, but to also testify as to the reasons for his fabrication and the reasons why he decided to change his story; and all of the incidents and factors that shed light upon his credibility, both pro and con, are admitted, subject to the Court's discretion, and left to the jury for its evaluation and determination. Naturally, a person who has made admittedly inconsistent statements stands impeached, but the court and the jury are still charged with the responsibility of ascertaining which evidence is to be credited and only by a full exposure of the relevant and pertinent facts in this difficult situation can the jury make an intelligent and reasonable attempt to ascertain the truth. In the case at bar there is no dispute about Riley's making either the consistent or the inconsistent statements. It is not a swearing match as to what was said but presents the crucial issue of which statements constitute a correct recital of the events under consideration. In this posture relevant evidence, particularly evidence which is subject to cross-examination, should in the discretion of the trial court be submitted to the jury for its evaluation.

## VII. DR. ALDERETE'S OPINION AS TO RILEY'S STATE OF MIND AT THE TIME HE GAVE THE PRIOR CONSISTENT STATEMENT

 Defendants argue that the Court erred in permitting Dr. Alderete to express his expert opinion on which version of the inconsistent statements given by Riley, Riley believed. Defendants contend that Dr. Alderete's statement that Riley believed the second, or consistent statement given by him to the doctors at the Federal Medical Center invaded the province of the jury and was an expression by Dr. Alderete of the guilt of defendants.

Dr. Wilinsky from the Medical Center was called as a witness by defendants, and was permitted to state his diagnosis of Riley, which was one of "sociopathic personality, anti-social reaction." Dr. Wilinsky testified extensively as to the psychiatric characteristics of a socio-

Credibility, "Subject to Rules 21 and 22, for the purpose of impairing or supporting the credibility of a witness, any party including the party calling him may examine him and introduce extrinsic evidence concerning any conduct by him and any other matter relevant upon the issues of credibility." The Comment to the Rule notes, "It makes the witness the witness of the court as a channel through which to get at the truth." Handbook of the National Conference of Commissioners on Uniform State Laws, p. 175 (1953).

While our holding does not, and need not, go as far as the view expressed by the National Conference of Commissioners, we cite the above as informative expressions, among others, of disapproval of rigid rules of evidence grounded merely in tradition which strip the trial court of discretion in admitting evidence before the jury, where the circumstances of the case warrant admission to ascertain the truth.

pathic personality and how they would affect such a person's ability to tell the truth.

The credibility of Riley being squarely at issue before the jury, the Government called Dr. Alderete, also a member of the staff of the Medical Center who had examined Riley. Government counsel asked and Dr. Alderete responded:

"Q. Now sir, I am asking which version did Mr. Riley believe to be the truth, not your belief, but his belief? Is my question clear?

"A. Yes, sir, your question is clear. And Riley believed the second version which was that he had had some help and assistance in the bank robbery."

Defense counsel then cross-examined Dr. Alderete and asked his expert opinion as to whether there was a reliable way to determine when Riley was telling the truth, Dr. Alderete responding that there exists no "black and white test" and that it "is strictly a matter of judgment and experience of the examiner who questions the person."

We disagree that the opinion of Dr. Alderete "decided the jury issue of credibility" and preempted "the jury from its decision making function" as defendants argue. Dr. Alderete's qualifications were not contested by defendants, and defendants were afforded ample opportunity to determine the basis of Dr. Alderete's opinion. The inability of Riley to tell the truth was the thrust of defendants' case. Government counsel's question was carefully framed and asked no more or less of Dr. Alderete than did Riley believe the version given by him in June 1966 to be the correct version of his contradictory statements. Dr. Alderete was not asked, and was precluded by the framing of the question, whether he believed Riley's statement. The question was a proper one for expert opinion.

While defendants urge that Dr. Alderete's opinion "decided" the issue of credibility, it was but one of the factors the jury had to take into consideration as the record is replete with the expert testimony of Dr. Wilinsky (and Dr. Alderete) defining and explaining the characteristics of a sociopathic personality. Riley naturally was subjected to a vigorous and extensive cross-examination; was an admitted accomplice and admittedly had fabricated his initial version of the robbery. His credibility became a vital issue. The Court carefully instructed the jury:

"You should consider such expert opinion received in evidence in this case, and give it such weight as you may think it deserves. If you should decide that the opinion of an expert witness is not based upon sufficient education and experience, or if you should conclude that the reasons given in support of the opinion are not sound, you may reject the opinion entirely."

It is not to be disputed that "This court has long held generally that an expert, as distinguished from a lay witness, may express his opinion on the ultimate jury question." Feguer v. United States, 302 F.2d 214, 242 (8 Cir. 1962), cert. denied 371 U.S. 872, 83 S.Ct. 123, 9 L.Ed.2d 110, and cases cited. In this case, Dr. Alderete expressed his opinion as to whether Riley believed the statement given him when Riley made it. This is far short of Dr. Alderete expressing his expert opinion that he believed Riley's statement, or that Dr. Alderete believed the defendants guilty in accordance with Riley's statement. While we agree with defendants that Dr. Alderete's expert opinion was directed to the crucial issue, the opinion evidence was not inadmissible as a matter of law. *Feguer*, supra.

## VIII. THE TESTIMONY OF DR. ALDERETE REGARDING WHY RILEY CHANGED HIS PRIOR STATEMENT

In direct examination of Dr. Alderete, Government counsel in inquiring about the psychiatric staff report of July 19, asked Dr. Alderete if he recalled the statement in the report that "Patient states that he was pushed into

the alleged crime with which he is charged by other individuals." Dr. Alderete acknowledged the statement appeared in the report. Government counsel then asked, and Dr. Alderete responded:

"Q. What information did he give you as the basis for that statement in your report, Doctor?

"A. He advised me previous to this examination that he had been pushed into committing a bank robbery by three other individuals and that he wanted me to contact the F. B. I. and let them know about it. I then asked him why he had not said this previously and he stated to me, my wife has been harassed by an unknown caller, these individuals have threatened me and my wife and I fear for my life."

No objection to this portion of Dr. Alderete's testimony was made, and defendants did not move to strike it. Defendants now assert that the prejudicial effect of the testimony was of such magnitude that it constituted "plain error", subject to consideration under Rule 52(b), Fed.R.Crim.P., as improper hearsay testimony. We do not agree.

As stated in II Wigmore, Evidence, § 562 (3d Ed.1940):

"An expert witness, like any other witness, may be asked on the direct examination, or may be required, to state the *grounds of his opinion*, i.e. the general data which form the basis of his judgment upon the specific data observed by him. This is merely an application of the general principle of the knowledge-qualification (post, § 655)."

At § 655, Wigmore explains that in stating the grounds of knowledge forming the basis of opinion, the witness:

" * * * often will naturally state circumstances which may give indirectly some unfavorable impressions against the opposite party * * *. Or he may relate other persons' utterances which would be inadmissible as hearsay, but for their present utility.

"Nevertheless, * * * the general rule is that the witness *may* on the direct examination state the particular circumstances which legitimately affected his knowledge or recollection, even though the fact would otherwise be inadmissible; the judge's instruction to the jury must be relied upon for preventing their improper use of the fact:"

The testimony elicited, as forming the basis for an opinion rendered by an expert witness, was not inadmissible as hearsay. Government counsel pursued the matter about threats to Riley and his wife no further; no attempt was made to prove the truth of the statement, nor did Government counsel argue it in his summation to the jury. The trial court gave the following instruction to the jury: "The defendants are not on trial for any act or conduct not alleged in the indictment." Absent an objection or requested instruction by defendants, the trial court's instruction cured any prejudice that could have arisen in the circumstances here presented; if defendants had made timely objection, then the trial court probably should have given a more specific instruction limiting any possible misuse of the testimony by the jury; but this issue is not presented.

As this Court noted in Gendron v. United States, 295 F.2d 897, 902 (8 Cir. 1961):

"The application of Rule 52(b) rests within the sound judicial discretion of the appellate court. The normal rule is that an appellate court should not consider questions which have not been properly raised in the trial court and upon which the trial court has had no opportunity to pass. The plain error rule should be applied with caution and should be invoked only to avoid a clear miscarriage of justice. To exercise the right freely would undermine and impair the administration of justice and detract from the advantages derived from orderly rules of procedure."

In short, this case does not present a situation where this Court should exercise its discretion and even consider this issue as plain error under Rule 52(b).

## IX. DENIAL OF DEFENDANTS' MOTIONS FOR JUDGMENTS OF ACQUITTAL

Defendants' final allegation of error is that the evidence was insufficient for the jury to find the defendants guilty beyond a reasonable doubt and that the trial court erred in failing to grant their motions for acquittal. The main thrust of defendants' argument is that Riley's testimony, without which the defendant probably could not have been convicted, was in conflict with statements given by him on three different occasions, and in view of the psychological diagnosis of Riley's personality, his testimony could not be sufficient and adequate to support the convictions of guilt beyond a reasonable doubt.

 On appeal we take that view of the evidence which is most favorable to supporting the jury verdict; and all reasonable inferences that tend to support the action of the jury must be accepted as established. Koolish v. United States, 340 F.2d 513, 519 (8 Cir.1965), cert. denied 381 U.S. 951, 85 S.Ct. 1805, 14 L. Ed.2d 724; Smith v. United States, 331 F.2d 265, 278 (8 Cir. 1964), cert. denied 379 U.S. 824, 85 S.Ct. 49, 13 L.Ed.2d 34; Koop v. United States, 296 F.2d 53, 54 (8 Cir. 1961). The testimony of Riley was subjected to considerable impeachment because of his record and his prior inconsistent statements, and he was cross-examined thoroughly. The reasons, motives and circumstances surrounding Riley's previous statements concerning defendants' participation in the robbery were fully explored and presented before the trier of fact. While defendants argue that the corroborative evidence of the finding of the money taken in the robbery is explained by Riley's purchase of an auto from Hanger, and that the sighting of Riley and Hanger together is explained by the fact that they were shopping for a car for Riley—these are factual issues that were properly submitted to the trier of fact who resolved the issues against defendants.

 With regard to the lack of corroborative evidence as to defendant Mixen, defendants correctly cite the rule that the uncorroborated testimony of an accomplice is sufficient to sustain a conviction if the testimony is not otherwise incredible or insubstantial on its face. Wood v. United States, 361 F.2d 802, 804 (8 Cir.1966), cert. denied 385 U.S. 978, 87 S.Ct. 520, 17 L.Ed.2d 439; Williams v. United States, 328 F.2d 256, 259 (8 Cir.1964), cert. denied 377 U.S. 969, 84 S.Ct. 1651, 12 L.Ed.2d 739. A careful reading of the record shows that Riley's testimony is not "incredible" or "insubstantial on its face."; on the contrary it has the ring of truth. After being a "patsy," then threatened and harassed, he apparently decided to make a full exposure of the transaction. Further, the Court instructed the jury:

"While it is a rule of law that a person accused of crime may be convicted upon the uncorroborated testimony of an accomplice, still a jury should always act upon such testimony with great care and caution, and subject it to careful examination, in the light of all other evidence in the case; and the jury ought not to convict upon such testimony alone, unless, after a careful examination of such testimony they are satisfied beyond a reasonable doubt of its truth, and that they can safely rely upon it."

There is substantial evidence in the record to support a finding of guilt as to each of the defendants, as defendants admit, if the testimony of Riley is believed. The jury chose to believe Riley's testimony, rather than the explanations offered by defendants.

We affirm the judgment of the District Court.